Gaziano, J.
We address, in this opinion, the scope of criminal liability under the common-law felony-murder rule. The charges stem from an attempted armed robbery and home invasion of a Lowell townhouse shared by Hector and Tony Delgado. Two armed gunmen fatally shot the brothers during the botched robbery. The defendant was not present at the scene. The Common *807 wealth alleged that the defendant was liable as an accomplice to felony-murder because he supplied one of the gunmen with a pistol and provided hooded sweatshirts to the intruders to help them conceal their identities. A Superior Court jury convicted the defendant of two counts of felony-murder in the first degree based on the predicate felonies of an attempted commission of armed robbery, home invasion, unlawful possession of a firearm, and unlawful possession of ammunition.
The defendant raises the following claims on appeal: (1) the Commonwealth failed to produce sufficient evidence to prove that he was a knowing participant in the felony-murders; (2) the judge provided erroneous instructions on shared intent and accomplice liability; (3) portions of the prosecutor’s opening statement and closing argument were improper; (4) the judge should have excluded prejudicial evidence of prior misconduct; (5) the judge asked improper voir dire questions of potential jurors; and (6) we should abolish the felony-murder rule. The defendant also asks us to order a new trial under our extraordinary authority pursuant to G. L. c. 278, § 33E.
We conclude that the Commonwealth introduced sufficient evidence to prove that the defendant knowingly participated in the underlying felonies and, therefore, was an accomplice to felony-murder. We conclude also that the defendant’s other challenges do not raise error warranting reversal or a new trial as to any of the convictions. Nonetheless, in the circumstances of this case, we are convinced that, pursuant to our authority under G. L. c. 278, § 33E, the interests of justice require that the degree of guilt be reduced to that of murder in the second degree.
As to whether we should abolish the common-law felony-murder rule, a unanimous court concludes that the felony-murder rule is constitutional. However, a majority of Justices, through the concurrence of Chief Justice Gants, conclude that the scope of felony-murder liability should be prospectively narrowed, and hold that, in trials that commence after the date of the opinion in this case, a defendant may not be convicted of murder without proof of one of the three prongs of malice. As a result, in the future, felony-murder is no longer an independent theory of liability for murder. Rather, felony-murder is limited to its statutory role under G. L. c. 265, § 1, as an aggravating element of murder, permitting a jury to find a defendant guilty of murder in the first degree where the murder was committed in the course of a felony punishable by life imprisonment even if it was not *808 committed with deliberate premeditation or with extreme atrocity or cruelty. Because the majority holding as to common-law felony-murder liability is prospective in effect, it does not affect the judgment reached in this case. Because I disagree with that holding, I write separately in a concurrence to explain my reasoning.
1. Background. Because the defendant challenges the sufficiency of the evidence of the extent of his involvement in the armed home invasion, and his shared intent to commit that crime, we recite the facts the jury could have found in some detail.
a. Facts. On the evening of October 22, 2009, the defendant was a passenger in a green Honda Civic automobile that was being driven around the Pawtucketville section of Lowell. The other occupants of the vehicle were his friends Ariel Hernandez, Giovanni Hill, and Darien Doby. Hernandez was the driver. Hill was in the front passenger seat, and the defendant and Doby shared the rear passenger seat. Hernandez drove past two men walking on the street and raised the possibility of robbing them. The passengers convinced Hernandez not to do so.
A short time later, Hill and Hernandez noticed two women walking down the street. Hernandez pulled into a side street and parked. Hill and Hernandez got out of the vehicle and Hernandez removed a firearm from the trunk. The two rounded the corner and confronted the women while the defendant and Doby waited in the vehicle. Hill stood and watched from a few feet away as Hernandez, gun in hand, grabbed their purses. The two men returned to the vehicle, and Hernandez drove away, with the purses and the handgun in his lap. He stopped at a friend’s house to exchange the green hooded sweatshirt he had been wearing for a black sweatshirt without a hood.
The defendant, Doby, and Hill left the friend’s house, while Hernandez stayed behind. The four men later met at the defendant’s one-bedroom apartment. Hernandez stashed the handgun he had used in the robbery (a nine millimeter pistol) in a kitchen cabinet above the refrigerator. He rifled through the purses, pulling out cash, driver’s licenses, and automated teller machine (ATM) cards. Hernandez found what appeared to be a passcode for one of the ATM cards written on a scrap of paper, and sent Hill to a bank to attempt to withdraw money with the card. Before he left, Hill borrowed the defendant’s black sweatshirt so he could change out of the jacket he had worn during the robbery. When he returned, Hill reported that he had been unsuccessful in withdrawing any money.
*809 Later, at approximately 12:15 a.m., two cousins, Jamal and Karon McDougal, visited the defendant’s apartment.[2] They were joined by one of their friends, Joshua Silva. While gathered in the kitchen with the defendant, Jamal asked Hernandez if he wanted to participate in robbing someone who owed money to one of Jamal’s friends. Karon predicted that the robbery would be “pretty easy.” He warned the others, however, that they were going to rob two “pretty big guys” who worked in bars.[3] Hernandez agreed to participate in the robbery. Silva joined them as the getaway driver.
Once Silva agreed to participate, Hernandez urged, “If we’re going to do it, let’s go do it now.” Hernandez retrieved his gun from the kitchen cabinet, looked it over, and tucked it inside his waistband. Still wearing the hoodless black sweatshirt he had changed into after the earlier robbery, Hernandez asked the defendant for a hooded sweatshirt so that he could “hide his face.” The defendant provided Hernandez with a hooded sweatshirt with a front zipper. Hernandez complained that the zipper was broken and that some part of his shirt would be visible. The defendant then gave Hernandez a black and red pullover-style hooded sweatshirt with a white Red Sox “B” logo on the front. Jamal and Karon also borrowed hooded sweatshirts from the defendant.
Before leaving, Jamal asked to borrow the defendant’s “burner” (gun). At first, the defendant hesitated, stating his concern that something might happen to his gun. Hernandez and Karon then urged the defendant to allow Jamal to borrow the gun, promising that “nothing’s going to happen to it.” The defendant eventually gave Jamal a .380 pistol that had been stored underneath his bed.
Jamal, Karon, Hernandez, and Silva left the defendant’s apartment and drove in Silva’s Toyota Camry automobile to the victims’ townhouse. Silva drove, and Jamal gave directions. After Silva parked on a nearby side street, Jamal, Karon, and Hernandez got out and approached the townhouse, while Silva waited in the vehicle. Shortly after 1 a.m., the occupants of the townhouse heard loud banging on the front door. From a fourth-floor win *810 dow, Tony called out, “Who’s there?” A voice that sounded female responded “Nicole,” or “Nicki.” Tony went downstairs and opened the front door. His housemates heard a scuffle at the bottom of the stairs near the door, and then Jamal and Hernandez chased Tony up the stairs into the second-floor living room.
A visitor had been sleeping on the living room couch. He saw Jamal threaten Tony with a gun, demanding, “Where’s everything?” Tony responded that “[a]ll [he] see[s] is dimes.” The visitor was unable to identify Jamal, whose face was obscured by a hooded sweatshirt. Hector and one of his roommates, Brian Staples, headed downstairs from their third-floor bedrooms and entered the living room. At that point, Jamal had Tony in a headlock and was pointing the gun at his head.[4] Hernandez rushed toward Staples, brandishing a gun, and ordered him upstairs. Staples and Hector ran upstairs to hide. Tony managed to break free from Jamal and also ran up the stairs. Jamal and Hernandez followed him.
From his hiding place, Staples heard Hector’s door being kicked in, followed by an argument, and then gunshots. Once the shooting stopped, Hector was found lying face up on his bed, gasping for air. He had been shot three times and shortly thereafter died of multiple gunshot wounds. Tony, fatally shot in the abdomen, managed to stagger to the fourth floor, where he was treated at the scene before he died. Police recovered five nine millimeter cartridge casings from Hector’s bedroom.
After the gunshots, Jamal and Hernandez ran outside, cheering and exchanging “high fives.” They met up with Karon and Silva and drove back to the defendant’s apartment. En route to the apartment, Jamal and Hernandez informed Karon that they had been unable to steal anything. Jamal remarked that Hernandez was a good shot, and Hernandez responded, “Yeah, once I seen them jump on you, I just started shooting.” Jamal returned the defendant’s gun to him. Hernandez asked the defendant if he could leave his own gun at the defendant’s apartment. When the defendant said no, Hernandez gave the gun to Hill and told him to put it in the trunk of the Honda Civic. Jamal, Karon, and Hernandez removed the borrowed sweatshirts and left them in the defendant’s living room.
*811 Within an hour of the shootings, Lowell police spotted Hernandez driving the green Honda Civic that had been used in the earlier robbery. They stopped the vehicle, arrested Hernandez and Hill, and found the gun Hernandez had used in the shooting hidden in the trunk.
Detectives interviewed the defendant on October 24 and 25, 2009. He initially told police that he had purchased a .380 handgun “for protection,” which he kept under his mattress. Eventually, the defendant admitted to having given this gun to Hernandez and the other men on the evening of the shootings. The defendant first said that he did not know what Hernandez and the other men were going to do with the gun. Eventually he stated that he believed they were going to rob someone, based on conversations that he overheard inside his apartment and the fact that Hernandez had robbed two women earlier that evening.
b. Prior proceedings. The defendant was indicted on two counts charging murder in the first degree in the deaths of Hector and Tony Delgado, home invasion, unlawful possession of a firearm, and unlawful possession of ammunition. The defendant was tried before a Superior Court jury on the theory of felony-murder with the underlying offenses of attempted armed robbery and home invasion as the predicate felonies. The jury convicted the defendant on all charges.
2. Discussion. The defendant’s primary argument on appeal is that the Commonwealth failed to produce sufficient evidence to prove that he participated in the underlying felonies, i.e., that he shared the intent of the other participants to commit an armed robbery. He also argues that the judge erroneously instructed the jury on the issues of shared intent and accomplice liability; portions of the prosecutor’s opening statement and closing argument were improper; the judge abused her discretion by allowing the introduction of evidence of uncharged misconduct; and, during voir dire, the judge asked potential jurors an impermissible question. The defendant contends also that this court should abolish the felony-murder rule. In addition, he asks us to exercise our extraordinary authority under G. L. c. 278, § 33E, to reverse the murder convictions as against the weight of evidence. We address each argument in turn.
a. Sufficiency of the evidence. In reviewing the denial of a motion for a required finding of not guilty, we apply the familiar Latimore standard. See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). “[The] question is whether, after viewing *812 the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under this standard of review, we resolve issues of witness credibility in favor of the Commonwealth. Commonwealth v. Dilone, 385 Mass. 281, 286 (1982). In determining whether a reasonable jury could find each element of the crime charged, we also do not weigh the supporting evidence against conflicting evidence. Commonwealth v. Lao, 443 Mass. 770, 779 (2005).
To convict the defendant of felony-murder on a theory of accomplice liability, the Commonwealth was required to prove beyond a reasonable doubt that the defendant knowingly participated in the commission of one of the underlying felonies, alone or with others, with the intent required for that offense.[5] Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009). See Commonwealth v. Silva, 471 Mass. 610, 621 (2015) (Commonwealth required to prove defendant’s “knowing participation in some manner in the commission of the offense” together with shared intent); Commonwealth v. Akara, 465 Mass. 245, 253 (2013) (court considers whether defendant actively participated in events leading to victims’ deaths); Marshall v. Commonwealth, 463 Mass. 529, 536-537 (2012) (conduct that historically had been described as accessory before fact “plainly falls under the rubric of accomplice liability”). In this case, where the predicate felonies were attempted armed robbery and armed home invasion, the Commonwealth also was required to prove that the defendant knew that one of his accomplices possessed a firearm. Commonwealth v. Garcia, 470 Mass. 24, 31 (2014).
Knowing participation in a criminal offense “may take any of several forms” and includes providing “aid or assistance in com *813 mitting the crime.” Zanetti, 454 Mass, at 470 (Appendix). To establish guilt on a theory of accomplice liability, the Commonwealth is not required to prove that a defendant was physically present at the scene of the offense. Commonwealth v. Ortiz, 424 Mass. 853, 858-859 (1997). A defendant may be convicted as a coventurer when he or she is not present at the scene of a crime ‘“so long as the jury [find] [that the defendant] had actually associated [himself or herself] with the criminal venture and assisted in making it a success.” Commonwealth v. Silanskas, 433 Mass. 678, 690 n.13 (2001), quoting Ortiz, supra. See Commonwealth v. Hanright, 466 Mass. 303, 310 (2013) (‘“[C]omplicity in the underlying felony is sufficient to establish guilt of [felony-murder] if the homicide followed naturally and probably from the carrying out of the joint enterprise” [citation omitted]); Commonwealth v. Benitez, 464 Mass. 686, 690 n.6 (2013) (‘“a person need not be physically present at the scene of the crime in order to participate as a joint venturer”).
We do not agree with the defendant’s contention that the evidence, at best, established that he was present inside an apartment where others planned a robbery, and that his mere ‘“acquiescence in a request to produce clothing or a firearm does not confer joint venture liability.” There was sufficient evidence from which a reasonable jury could have found beyond a reasonable doubt that the defendant knowingly participated in the predicate felonies. He was present in his apartment when Jamal and Karon openly solicited others to help rob ‘“the pretty big” ‘“Puerto Rican guy.” Hernandez agreed to join the robbery, announced that he would use his own gun, and retrieved it from its hiding place inside the defendant’s kitchen cabinet. Jamal then asked to borrow the defendant’s gun. The defendant expressed concern over the possibility that something would happen to it. Karon and Hernandez urged the defendant to lend the gun to Jamal, assuring him, “Nothing is going to happen to it.” The defendant agreed and gave Jamal the gun.
In his statement to police, the defendant admitted that he gave the gun to Hernandez and the other men knowing that it was going to be used in a robbery. See Benitez, 464 Mass. at 690 (act of providing accomplice with gun supports finding that defendant knowingly and actively participated in armed robbery); Commonwealth v. Melton, 436 Mass. 291, 301 (2002) (defendant’s participation in joint venture supported by evidence that he supplied firearm to shooter). See also Commonwealth v. Gunter, 427 Mass. *814 259, 261, 265 (1998) (defendant who remained in vehicle while his accomplices entered apartment and robbed rival drug dealers actively participated in felony-murder). The jury also reasonably could have found that the defendant gave hooded sweatshirts to his accomplices to help them avoid detection. Prior to the robbery, Hernandez asked the defendant for a hooded sweatshirt so that he could “hide his face.” The defendant provided Hernandez with a hooded sweatshirt with a front zipper. When Hernandez complained that the zipper was broken, and that some part of his shirt would be visible, the defendant gave him a pullover-style hooded sweatshirt. Jamal and Karon also borrowed hooded sweatshirts from the defendant. After the robbery, Hernandez, Karon, and Jamal drove directly to the defendant’s apartment and returned the sweatshirts to him rather than wearing them in public.
It also is reasonable to infer that the instruments supplied by the defendant played an important role in the underlying crimes of attempted armed robbery and home invasion. Jamal, armed with the defendant’s pistol, forced his way into the Delgados’ townhouse. See Commonwealth v. Netto, 438 Mass. 686, 702-703 (2003) (circumstances may dictate that weapon is necessary to overcome anticipated resistance from victims). Once inside, Jamal used the gun to threaten Tony and demand money and drugs. Further, the hooded sweatshirts provided by the defendant hindered the ability of the other occupants of the townhouse to identify the intruders.
We conclude, therefore, that the jury reasonably could have found that the defendant was an active participant in the commission of the underlying felonies.
b. Jury instructions. The defendant contends that three of the judge’s instructions concerning shared intent and accomplice liability were erroneous. First, he argues that the judge’s instruction on intent and shared intent shifted the burden of proof by imposing a “mandatory rebuttable presumption,” which instructed the jury that the defendant’s conduct “necessarily indicated [his] knowledge and support of every aspect of criminal conduct that occurred.” Second, he argues that it was error for the judge to refer to the theory of accomplice liability while instructing on the substantive felony charges. Third, he argues that the judge misstated the burden of proof. Because there was no objection to these instructions, we review these claims to determine whether there was error and, if so, whether it created a *815 substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 681 (1992).
We turn first to the defendant’s argument that the instruction on intent impermissibly shifted the Commonwealth’s burden of proof to him. The defendant characterizes the following jury instructions as having created an impermissible “mandatory re-buttable presumption”:
“[Y]ou may determine the defendant’s intent from any statement or act committed or omitted and from all the other circumstances that indicate a state of mind provided first you find that any or ah such circumstances occurred.
“Now, the jury may but not need necessarily infer from the conduct of a person that he intended the natural and prob-abl[e] consequences of his own acts.

“[T]he Commonwealth must also prove beyond a reasonable doubt that at the time the defendant knowingly participated in the commission of the crime and, as I’ve indicated, the felonies involved are attempted armed robbery and home invasion, that he possessed or shared the intent required for that crime. And when I define the essential elements, I’m going to be telling you what the intent is. You’re permitted but not required to infer the defendant’s mental state or intent, from his knowledge of the circumstances and any subsequent participation in the crime. The inferences you draw must be reasonable and you may rely upon your experience and common sense in determining the defendant’s knowledge or intent.”
The due process clause of the Fourteenth Amendment to the United States Constitution requires the Commonwealth to prove every essential element of the offense beyond a reasonable doubt. Matter of Winship, 397 U.S. 358, 364 (1970). “Instructions to the jury that would lead them to believe otherwise are constitutional error.” Commonwealth v. Cruz, 456 Mass. 741, 752 (2010), cihng Sandstrom v. Montana, 442 U.S. 510, 521 (1979). See Francis v. Franklin, 471 U.S. 307, 313 (1985) (due process clause prohibits use of evidentiary presumption that relieves government of its burden). An instruction that the jury reasonably could have interpreted as a mandatory presumption violates due process and *816 cannot stand. See DeJoinville v. Commonwealth, 381 Mass. 246, 252 (1980). By contrast, there is no constitutional infirmity where a jury instruction creates only a permissive inference. Id. at 253. See Commonwealth v. Ely, 388 Mass. 69, 76 (1983) (permissive inference that allows jury to infer elemental fact from proof by prosecutor of another fact does not shift burden of prooí).
As the United States Supreme Court noted in Francis, 471 U.S. at 313, the analysis is relatively straightforward — a reviewing court must determine whether the challenged portion of an instruction created an unconstitutional mandatory presumption or merely a permissive inference. In this case, we conclude that the instructions on intent created permissive inferences. The judge did not instruct the jury that they were to presume that certain facts were proved, or that they were required to reach a particular conclusion. Compare id. at 316 (instruction that person of sound mind and discretion is presumed to intend natural and probable consequences of his or her actions is mandatory presumption “cast in the language of command”); Commonwealth v. Nolin, 448 Mass. 207, 217-218 (2007) (instruction that person is presumed to intend natural and probable consequences of his or her acts improperly shifts burden of proof to defendant).
To the contrary, here, rather than being “cast in the language of command,” the challenged instructions were permissive. The judge instructed that intent and knowledge ordinarily cannot be proved by direct evidence, and then added, “[Y]ou may determine the defendant’s intent from any statement or act committed or omitted and from all the other circumstances that indicate a state of mind provided first you find that any or all such circumstances occurred” (emphasis supplied). She then continued, “[T]he jury may but not need necessarily infer from the conduct of a person that he intended the natural and probabl[e] consequences of his own acts” (emphasis supplied). The judge instructed as follows on shared intent: “You’re permitted but not required to infer the defendant’s mental state or intent, from his knowledge of the circumstances and any subsequent participation in the crime” (emphasis supplied). See Hill v. Maloney, 927 F.2d 646, 651 (1st Cir. 1990) (words “you may infer” clearly indicated that inferences of malice and intent were permissive).
Such permissive intent instructions do not run up against a defendant’s right to due process. See Commonwealth v. Van Winkle, 443 Mass. 230, 239 (2005) (no error in instruction that “jury may infer, though it is not required to do so, that a person *817 intends the natural and probable consequences of an act that is knowingly done”); Ely, 388 Mass. at 76 (instruction that permits, but does not require, jury to infer intent does not violate due process). Indeed, the inferences on permissive intent also are included in the model jury instructions on homicide, explaining shared intent: ‘“You are permitted, but not required, to infer the defendant’s mental state or intent from his [or her] knowledge of the circumstances or any subsequent participation in the crime.” Model Jury Instructions on Homicide 15 (2013). A similar instruction is included in the instruction concerning the intentional use of a dangerous weapon: “As a general rule, you are permitted (but not required) to infer that a person who intentionally uses a dangerous weapon on another person intends to kill that person . . . .” Id. at 92.
The defendant argues that the judge’s instructions on attempted armed robbery and home invasion were erroneous because she improperly linked the phrase “aider and abettor” with the definition of the elements of the underlying offenses. The defendant contends that “[t]hese instructions were confusing and implied that the jury should presume that the defendant was an aider and abettor, with the requisite knowledge and intent pertaining to home invasion and attempted armed robbery.” There was no error.
Before defining the elements of each underlying offense, the judge explained, “[W]henever I say the defendant, I always mean as an aider or abettor or a joint venturer.”[6] In Zanetti, 454 Mass. at 468 n.22, we recommended that judges incorporate the concept of accessory liability within their instructions on substantive offenses. Here, the judge properly and consistently instructed the jury that the Commonwealth bore the burden to prove that the defendant knowingly participated in the predicate offense, with the requisite shared intent.
In his third claim of error in the instructions, the defendant argues that the judge made a misstatement at the end of her instructions on the predicate offenses, when she said, “If after *818 your consideration of all the evidence you find the Commonwealth has not proven any one of these elements beyond a reasonable doubt you must find the defendant guilty of murder in the first degree.” This misstatement was a clear slip of the tongue that went unnoticed by the judge and by the attorneys. Throughout her comprehensive charge, the judge properly instructed the jury on the presumption of innocence and the Commonwealth’s burden of proving each essential element of the offense beyond a reasonable doubt. Thus, the misstatement was isolated and did not result in a substantial likelihood of a miscarriage of justice. See Commonwealth v. Oliveira, 445 Mass. 837, 844-845 (2006).
c. Prosecutor’s opening statement and closing argument. The defendant maintains that the prosecutor misstated the evidence, both in her opening statement and in her closing argument. For instance, the defendant points to the prosecutor’s asserted improper argument that the defendant ‘“planned and executed” the attempted armed robbery and the home invasion. The defendant contends that the prosecutor misstated the evidence by arguing that ‘“but for” the defendant’s participation, the crimes would not have occurred.
We begin with the prosecutor’s opening statement. Because defense counsel timely objected, we review for prejudicial error. See Commonwealth v. Santiago, 425 Mass. 491, 500 (1997).
The purpose of an opening statement is to ‘“outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence” (citation omitted). Commonwealth v. Fazio, 375 Mass. 451, 454 (1978). Here, the prosecutor’s opening statement did not exceed the bounds of propriety. She used a sports analogy to explain the Commonwealth’s theory of the case, stating that the defendant had been part of a team that planned and executed a botched home invasion. She emphasized that each team member played a particular role, and that the defendant contributed to the team effort by supplying a firearm and some clothing needed for disguise. The prosecutor also argued that the team effort ultimately resulted in the deaths of the Delgado brothers. The prosecutor’s characterization of the defendant’s role in the shootings as the person who allegedly provided ‘“that .380 gun and hoodies to the team” did not misstate the evidence.
The defendant raises a similar argument with respect to the prosecutor’s closing, which carried on the sports analogy. Because trial counsel did not object, we consider whether any of the *819 challenged statements was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Penn, 472 Mass. 610, 626-627 (2015), cert. denied, 136 S. Ct. 1656 (2016).
In closing, the prosecutor urged the jury to draw an inference, based on the evidence, that the defendant knew about the intended robbery and was an active participant in it. She pointed out that the defendant was aware that Hernandez had robbed two women earlier in the evening, the defendant was present when the men discussed robbing the two victims, and he knew that Hernandez would be bringing his gun to the robbery. The prosecutor described the defendant’s role as providing “the tools to the rest of the team to effectuate this armed robbery and home invasion.” This was not beyond the bounds of permissible advocacy.
The defendant contends also that a portion of the prosecutor’s closing argument misstated the evidence. While discussing Hernandez’s attempt to hide his gun in the defendant’s apartment after the attempted robbery, the prosecutor said the defendant “knew that that gun was just used in a crime. The crime that he helped plan.” The defendant maintains that this statement “reiterated the false theme that [he] was a planner whose role was critical.” In the context of the closing argument as a whole, however, see Commonwealth v. Foxworth, 473 Mass. 149, 161 (2015), this isolated statement was unlikely to have prejudiced the defendant. Throughout the trial, the prosecutor clearly proceeded on the theory that the defendant was liable because he had supplied necessary instruments that facilitated the commission of the underlying felonies, just as she presented his role on the “team” in her opening statement.[7]
d. Evidence of uncharged prior misconduct. The defendant maintains that the judge abused her discretion in allowing the introduction of evidence of the prior armed robbery, as well as photographs showing the defendant and an accomplice brandishing handguns. The defendant argues that this evidence “over *820 whelmed” the case with unfair prejudice. This argument is unavailing.
Evidence of a defendant’s prior or subsequent bad acts is not admissible to show ‘“bad character or criminal propensity.” Commonwealth v. Lally, 473 Mass. 693, 712 (2016). It may be admissible, however, where it is relevant for another purpose, such as to establish a “common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive.” Commonwealth v. Helfant, 398 Mass. 214, 224-225 (1986). We review questions of admissibility, probative value, and unfair prejudice for abuse of discretion, id. at 229, and do not disturb a trial judge’s decision absent a clear error of judgment in weighing the relevant factors, see L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). In deciding whether to allow the admission of such evidence, a judge must decide whether the probative value of the evidence is outweighed by the risk of unfair prejudice to the defendant. See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).
In the circumstances here, the judge did not abuse her discretion in allowing the introduction of evidence concerning the armed robbery earlier in the afternoon on the day of the killing, while the defendant waited in the vehicle; such evidence was probative of Hernandez’s intent to rob the Delgado brothers, and the defendant’s shared intent to participate in that crime by supplying the guns and the means for potential disguise. Indeed, in his statement to police, the defendant admitted that, as a result of the earlier robbery, he believed Hernandez and the others intended to commit another armed robbery at the time he handed them his gun.
We also discern no error in the introduction of the photographs showing the defendant brandishing his gun. The photographs were introduced to establish his access to a weapon that was used in the commission of the underlying felonies — the armed home invasion and the attempted armed robbery. See Commonwealth v. Corliss, 470 Mass. 443, 450 (2015) (judge has discretion to admit evidence that defendant previously possessed weapon that could have been used to commit crime); Commonwealth v. Tassinari, 466 Mass. 340, 353 (2013) (information about defendant’s possession of firearms admissible where connected to commission of crime). The photographs, which were taken a few weeks before the shootings, showed the defendant and Hernandez displaying their respective weapons. Because both guns were introduced in *821 evidence, the prejudicial impact of the photographs was minimal.
e. Jury voir dire. During a pretrial hearing, the judge informed counsel that she intended to ask the venire a question concerning joint venture liability. Defense counsel responded, “Yes, I think that would be fine, Judge.” At trial, the judge asked potential jurors, “Is there anything about the concept of aiding and abetting that would prohibit your ability to listen and apply the law as I will explain it to you at the conclusion of the trial and be a fair and impartial juror?” The defendant did not object.
On appeal, the defendant contends that this question reduced the Commonwealth’s burden of proof and “ensur[ed] a jury predisposed to find [him] guilty.” Because the issue is unpreserved, we review to determine whether asking the question was erroneous and, if so, whether it created a substantial likelihood of a miscarriage of justice. Wright, 411 Mass. at 681.
During jury selection, a judge is required to “examine jurors fully regarding possible bias or prejudice where ‘it appears that there is a substantial risk that jurors may be influenced by factors extraneous to the evidence presented to them.’ ” Commonwealth v. Perez, 460 Mass. 683, 688 (2011), quoting Commonwealth v. Garuti, 454 Mass. 48, 52 (2009). The judge may ask questions designed to “determine whether jurors [can] set aside their own opinions, weigh the evidence . . . , and follow the instructions of the judge.” Commonwealth v. Bryant, 447 Mass. 494, 501 (2006), quoting Commonwealth v. Leahy, 445 Mass. 481, 495 (2005). The scope of jury voir dire is committed to the judge’s sound discretion, and we will uphold the judge’s questioning “absent a clear showing of abuse of discretion.” Commonwealth v. Gray, 465 Mass. 330, 338 (2013), quoting Perez, supra at 689, and cases cited.
We do not share the defendant’s view that the disputed question predisposed the jury to convict the defendant. A question may not be introduced if it “commit[ted] the jury to a verdict in advance” or “[had] the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present.” Gray, 465 Mass. at 339, quoting Perez, 460 Mass. at 691. Here, the judge sought to identify jurors who were unwilling or unable to follow her instructions regarding accomplice liability. Indeed, one potential juror reported, “I have more qualms about aiding and abetting being charged as a murder case.” That juror was excused without objection.
At the beginning of jury selection, the judge provided the members of the venire with a prelintinary instruction that the *822 Commonwealth was required to prove each essential element of the offense beyond a reasonable doubt. In addition, the judge instructed that it was the Commonwealth’s burden to prove joint venture liability by establishing that the defendant knowingly participated in the commission of the crime with the requisite intent to commit that crime. After jury selection, the judge properly instructed the seated jury a number of times that, in order for them to find the defendant guilty of felony-murder, the Commonwealth was required to prove that the defendant aided and abetted at least one of the underlying felonies. See Commonwealth v. Gray, 465 Mass. at 341 (court considers issues raised by question to venire in context with judge’s conduct of entire empanelment and judge’s legal instructions on topic). We conclude that the judge had discretion to ask the venire a question regarding their ability to follow her legal instructions, and that the defendant has failed to demonstrate a substantial likelihood of a miscarriage of justice.
f. Abolition of the felony-murder rule. The felony-murder rule “imposes criminal liability for homicide on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise.” Hanright, 466 Mass. at 307, quoting Commonwealth v. Matchett, 386 Mass. 492, 502 (1982). The defendant invites the court to abolish the felony-murder rule, arguing that it is arbitrary and unjust, and in violation of art. 12 of the Massachusetts Declaration of Rights. According to the defendant, the imposition of felony-murder liability is contrary to the fundamental notion that an individual is culpable for his or her own misconduct.
Felony-murder is a common-law crime.[8] See Matchett, 386 Mass. at 502. The felony-murder rule imposes criminal liability “on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise.” Commonwealth v. Watkins, 375 Mass. 472, 486 (1978). “ ‘The effect of the fel *823 ony-murder rule,’ both for principals and accomplices, ‘is to substitute the intent to commit the underlying felony for the malice aforethought required for murder.’ ” Hanright, 466 Mass. at 307, quoting Matchett, supra.
We consistently have rejected the argument that the felony-murder rule is unconstitutional, see Commonwealth v. Moran, 387 Mass. 644, 649-650 (1982), and Watkins, 375 Mass. at 486-487, or that it relieves the Commonwealth of its obligation to prove a defendant’s own moral culpability, see Hanright, 466 Mass. at 307-310; Commonwealth v. Richards, 363 Mass. 299, 307 (1973) (“A broad conception of complicity is indeed at work in the special field of so called felony-murder . . .”).
More recently, in Commonwealth v. Tejeda, 473 Mass. 269, 277 (2015), we considered the continued viability of the common-law felony-murder rule but did not reach the issue. Discussing the scope of vicarious liability, we noted that felony-murder is an exception to the general rule that “[o]ne is punished for his own blameworthy conduct, not that of others” (citation omitted). Id. at 276. Under the felony-murder rule, ‘“a person who knowingly participates in one crime as part of a joint venture is ‘ipso facto also guilty’ of [murder] committed by an accomplice in furtherance of the joint venture.” Id. We discern no reason to deviate from our decisions in Moran and Watkins, and to accept the defendant’s invitation that we abolish the felony-murder rule.
g. Review under G. L. c. 278, § 33E. The defendant asks also that we exercise our authority under G. L. c. 278, § 33E, to grant him a new trial because the felony-murder verdicts, ‘“as indicated by the prosecutor’s reliance on innuendo and misrepresentation,” were against the weight of the evidence. We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that the verdicts of felony-murder were neither contrary to our joint venture felony-murder jurisprudence nor against the weight of the evidence.
Our authority under G. L. c. 278, § 33E, however, also requires us to consider whether the convictions of murder in the first degree are consonant with justice. Commonwealth v. Gould, 380 Mass. 672, 680 (1980). ‘“If upon our exantination of the facts, we should, in our discretion, be of [the] opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare.” Common *824 wealth v. Baker, 346 Mass. 107, 109 (1963). The authority granted us under G. L. c. 278, § 33E, includes the discretion to reduce a conviction of felony-murder in the first degree in circumstances where the jury do not have that option. Commonwealth v. Paulding, 438 Mass. 1, 10 (2002) (it is left to court’s authority under G. L. c. 278, § 33E, and is not within jury’s role in reaching verdict, to reduce felony-murder in first degree to felony-murder in second degree).
We are cognizant that the court’s authority under G. L. c. 278, § 33E, should be used sparingly and with restraint. See Commonwealth v. Lannon, 364 Mass. 480, 486 (1974). The court does not serve as a second jury. Commonwealth v. Prendergast, 385 Mass. 625, 638 (1982). Moreover, the doctrines of felony-murder and joint venture liability “are well established and should not be undermined on an ad hoc basis.” Commonwealth v. Hooks, 375 Mass. 284, 298 (1978).
Nonetheless, we have recognized that “the doctrines of felony-murder and joint venture may, on some hypothetical fact patterns, produce a conviction of murder in the first degree that would appear out of proportion to a defendant’s culpability.” Commonwealth v. Rolon, 438 Mass. 808, 824 (2003). Here, the defendant was involved in the “remote outer fringes” of the attempted armed robbery and armed home invasion. See id. As discussed, the defendant should be held liable for felony-murder as a supplier of a firearm and clothing utilized by his cohorts in the commission of the underlying felonies. Having carefully reviewed the facts and circumstances of this case, we conclude that the defendant’s conduct, as an individual who participated on the “remote outer fringes” of the joint venture, makes verdicts of murder in the second degree more consonant with justice.
4. Conclusion. The verdicts of murder in the first degree and the sentences imposed are vacated and set aside. The matter is remanded to the Superior Court where verdicts of guilty of murder in the second degree are to be entered, and the defendant is to be sentenced accordingly. The defendant’s remaining convictions are affirmed.

So ordered.

Because they share a last name, we refer to Jamal and Karon McDougal by their' first names.

In addition to his full-time job. Hector, one of the victims, worked part time as a doorman at a local bar. Tony, the other victim, managed that bar and supplemented his income by selling small “dime bag” quantities of marijuana from the townhouse in Lowell where the brothers and their housemates lived.

Jamal and Hernandez told Silva, the getaway driver, that Staples had been unable to see the face of the person who grabbed Tony because the assailant “had the hood on.” Staples, however, had been able to see a portion of the other intruder’s face. He described the individual as dark skinned with a scruffy goatee, and he later identified Hernandez from a photographic array.

As for the substantive offenses, to support a finding of guilt of armed robbery requires proof that the defendant (or an accomplice) while armed with a dangerous weapon assaulted the victim and took money or property from the victim with the intent (or shared intent) to steal it. Commonwealth v. Williams, 475 Mass. 705, 710 (2016). An attempt is defined as (1) an intent to commit the underlying crime and (2) an overt act toward its commission. Commonwealth v. LaBrie, 473 Mass. 754, 760-761 (2016). To prove aimed home invasion, the Commonwealth must establish that the defendant (or his accomplice) entered a dwelling, while aimed with a dangerous weapon, and “use[d] force or threaten[ed] the imminent use of force upon any person within such dwelling.” Commonwealth v. Bois, 476 Mass. 15, 29 (2016), quoting G. L. c. 265, § 18C.

For example, at the beginning of her instructions on home invasion, the judge explained:
“To prove the defendant guilty of the crime of home invasion, the Commonwealth must convince you the jury of four elements beyond a reasonable doubt. That the defendant as an aider and abettor unlawfully entered the dwelling house of another. In other words, he doesn’t have to physically go there himself if he aided/abetted the entry.”

The defendant also argues that the prosecutor misstated the evidence by arguing that Jamal entered the townhouse because he was armed with the defendant’s pistol; Hernandez participated in the robbery because he wore a hoodie supplied by the defendant; and nobody would have entered the townhouse unless the defendant had supplied a firearm and disguises. There was no error. The Commonwealth was entitled to analyze the evidence and suggest reasonable inferences that the jury could draw from that evidence. Commonwealth v. Cole, 473 Mass. 317, 333 (2015).

Felony-murder also falls within the province of G. L. c. 265, § 1, which establishes two degrees of murder. That statute provides: “Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree.” General Laws c. 265, § 1, was enacted to “mitigate the harshness of the common law rule imposing a mandatory death penalty on all murderers.” Commonwealth v. Paulding, 438 Mass. 1, 8 (2002), discussing Commonwealth v. Dickerson, 372 Mass. 783, 803-805 (1977) (Quirico, J., concurring).