NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08768

COMMONWEALTH  vs.  JAMES ANTHONY MARTIN.


Middlesex.     December 5, 2019. - May 5, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Homicide.  Felony-Murder Rule.  Constitutional Law, Assistance
of counsel, Retroactivity of judicial holding.
Retroactivity of Judicial Holding.  Practice, Criminal,
Capital case, Assistance of counsel, Retroactivity of
judicial holding, Request for jury instructions.



Indictment found and returned in the Superior Court
Department on December 14, 1976.

The case was tried before Robert A. Mulligan, J., and a
motion for a new trial, filed on February 18, 2016, was heard by
Merita A. Hopkins, J.


Claudia Leis Bolgen for the defendant.
Timothy Ferriter, Assistant District Attorney, for the
Commonwealth.


GANTS, C.J.  On the evening of September 9, 1976, the

defendant, James Anthony Martin, attempted to steal the cash

that Richard Paulsen and his older brother, Edward, brought to

purchase drugs from Gordon Kent Brown in Brown's apartment in Cambridge. In doing so, the defendant shot and killed Edward[1] with a single gunshot in the chest. The defendant then fled to Canada, where he was apprehended late in 1999. On May 10, 2001, a Superior Court jury found the defendant guilty of murder in the first degree on the theory of felony-murder. He subsequently moved for a new trial, which motion was denied by a judge other than the trial judge, who had retired. We consolidated the defendant's direct appeal from his conviction with his appeal from the denial of the motion for a new trial.

The defendant makes three arguments on appeal. First, he contends that his motion for a new trial was wrongly denied because he was deprived of his constitutional right to the effective assistance of counsel, especially in light of strategic errors his attorney made in his opening statement, which resulted in a substantial likelihood of a miscarriage of justice. Second, the defendant claims that we should extend the reach of our holding in Commonwealth v. Brown, 477 Mass. 805, 807 (2017), cert. denied, 139 S. Ct. 54 (2018), to his case, where the appeal was pending when Brown was decided, even though we limited that holding to cases where trial commenced after the date of the opinion, which would exclude this case. Third, the

---

[1] To avoid confusion, we refer to Richard by his first name and Edward as the victim.

defendant argues that the trial judge committed prejudicial error when he declined the defendant's request that the jury be instructed on the elements of voluntary and involuntary manslaughter.

The defendant also asks that we exercise our extraordinary authority under G. L. c. 278, § 33E, and order a new trial or reduce the defendant's conviction to murder in the second degree, because his conviction of murder in the first degree is not consonant with justice. We affirm the defendant's conviction of murder in the first degree and the denial of his motion for a new trial, and after plenary review of the entirety of the record, we decline to exercise our authority under § 33E.

Background. We recite the facts as the jury could have found them in the light most favorable to the Commonwealth, reserving certain details for later discussion.

In 1976, the victim introduced Richard to a drug dealer, Brown, who could supply Richard with drugs. Richard's first purchase from Brown took place outside Symphony Hall in Boston. The victim accompanied Richard, who paid cash to Brown in exchange for the drugs. As testified to by Richard, the transaction went "very smoothly" and was a "friendly" interaction.

Richard's second purchase from Brown took place at Brown's apartment on the second floor of a three-story house in

Cambridge. The victim again accompanied Richard to the transaction, and in the living room of the apartment, Brown handed Richard the drugs in exchange for cash. During these first two transactions, Richard purchased an amount of marijuana for $150 and one pound of hashish for $900.[2]

For the third purchase, the victim arranged for Richard to buy one kilogram of hashish from Brown for $1,600 at Brown's apartment. On September 9, 1976, the victim and Richard arrived at the apartment between 9 P.M. and 9:30 P.M. Richard carried with him a box with a scale inside to weigh the hashish and $1,600 for the purchase. When they entered the apartment, Brown appeared to be agitated and uneasy, which was completely different from his "happy-go-lucky" demeanor during the first two transactions. Brown told Richard and the victim that the person bringing the drugs had not yet arrived. Brown said he was going to step out and buy some beer but would be right back.

Uncomfortable with Brown's behavior, the victim and Richard decided to leave the apartment. As they walked downstairs, they passed two people ascending the stairs -- a woman and a man -- later identified as Meredith Weiss and the defendant, who carried a paper bag. Once the victim and Richard were outside, Richard could see that the defendant and Weiss were inside

---

[2] Richard testified that he could not recall which of the two transactions involved hashish and which involved marijuana.

Brown's apartment. The victim and Richard returned to the apartment and asked Brown, who had since returned, whether those two individuals were the people with the drugs. Brown said that they were not, so the victim and Richard left again and drove around for fifteen minutes before returning to the apartment, with Richard still carrying the box containing the scale and the money. Brown, his demeanor still uneasy, let the brothers into the apartment and brought them into a bedroom. Brown then left them alone in the bedroom, telling them that he had to speak with his landlord.

Immediately after Brown left, the defendant entered the bedroom from an adjoining room. The defendant pointed a gun at Richard and the victim and asked them where the money was. The victim raised his hands in the air, palms wide open, and told the defendant to "wait a minute." The defendant then shot the victim in the chest from a distance of approximately five feet. The victim fell backwards, and Richard ran to him, guiding him to the floor. The defendant again asked where the money was, and Richard told him that the money was in their car. The defendant searched the victim's pockets and left.

After the defendant left the bedroom, Richard went out the window onto the porch and dropped to the ground. He saw people playing softball at a field across the street, so he ran over, screaming for help. Richard then led some ball players back to

the apartment, and two individuals performed cardiopulmonary resuscitation on the victim until emergency services arrived. The victim died that night of a single gunshot wound to the left chest.

Weiss, who was the defendant's girlfriend at the time, testified that she had driven the defendant to the apartment that evening.  The defendant told her that he needed to go to Brown's apartment for a drug deal, although Weiss did not see any drugs that day.  The defendant also told Weiss that he was carrying a gun for protection because he was concerned about selling drugs to individuals he did not know.  Weiss and the defendant passed two men as they went up the stairs to Brown's apartment.  After Brown spoke privately with the defendant, the defendant asked Weiss to wait downstairs, so she returned to the vehicle.  She had waited there about ten to twenty minutes when she heard a bang.

Five minutes later, Brown entered Weiss's car, followed shortly by the defendant.  Both men appeared panicked, and the defendant told Weiss, "Let's get out of here."  Weiss drove Brown and the defendant to the apartment in Somerville that she shared with the defendant and then to Medford, where they stayed for two nights at a friend's apartment.[3]  After learning that the

---

[3] Weiss testified that she could not recall if Brown was still with them when she and the defendant went to Medford.

victim had died, Weiss drove the defendant and Brown to a Boston-area bridge, where the firearm was thrown into the water, and continued on to the Port Authority bus station in New York City, where she dropped off the defendant and Brown.  Weiss continued on to her parents' home in New Jersey, where she was arrested and charged with being an accessory after the fact to murder.[4]

Brown and the defendant traveled by bus to California, where the defendant telephoned his cousin, Douglas Nesbitt, late one night and asked if they could stay with him.  Less than an hour later, the defendant and Brown appeared at Nesbitt's apartment.  Nesbitt testified that the defendant explained that he was in California because he had been involved in a drug deal in Cambridge involving "two white guys" that had "gone bad."[5] The defendant told Nesbitt that, while he was negotiating the drug deal, one of the white guys pulled out a gun and "tried to stick them up."  He and one of the white guys wrestled over the gun, and the older white guy got shot.  When Nesbitt returned home the next day, the defendant and Brown had left.

---

[4] This charge was dismissed without prejudice in 1977.  In 1982 Weiss entered into an agreement with the Commonwealth in which the Commonwealth agreed not to renew charges against her if she agreed to testify against Brown at his 1982 trial and against the defendant if and when he was arrested and tried.

[5] The victim and Richard are Caucasian; the defendant is black.

The defendant remained a fugitive for many years.  In December 1999, he was apprehended by Canadian authorities in Montreal, where he lived under a different name, and was brought to Massachusetts to be tried for murder.

Richard Kaufman, a forensic chemist at the State police crime laboratory, analyzed the victim's jacket for gunpowder residue in the area where the bullet penetrated the victim's chest and did not detect any nitrate particles or partially burned gunpowder particles around the hole in the jacket.  He testified that if the weapon had been fired close to the garment, there would be gunpowder residue in that area.

William Duke, a State police ballistician, attended the victim's autopsy and offered the opinion that, in light of the lack of evidence of any surrounding tissue damage or powder on the skin, the wound was not a contact wound, that is, the muzzle of the weapon was not touching or very close to the victim or to the victim's clothing when it was fired.  Duke further opined that, if the firearm had been shot within one foot of the victim, he would expect to see plainly visible gunshot residue particles on the jacket; if the firearm had been shot within six inches, he would expect to see a heavier concentration of gunshot residue with less spread; and if the firearm had been pressing up against the jacket when it was fired, he would expect to see an entrance wound almost the size of a golf ball,

with heavy black singe and burn marks plainly visible on the jacket.

Discussion. 1. Ineffective assistance of counsel. The defendant gives three reasons why he was deprived of his constitutional right to the effective assistance of counsel. First, defense counsel in his opening statement told the jury that Brown would testify that "this was an armed robbery and not a drug deal," even though the prosecutor had not expressly promised to call Brown as a witness, and defense counsel did not intend to call him; Brown ultimately did not testify at trial. Second, defense counsel promised in his opening statement to elicit through cross-examination of the testifying police officers "how drug deals are handled," but never elicited that testimony at trial. Third, defense counsel visited the defendant only six times before trial and failed adequately to prepare for trial. We address each claim in turn.

a. Describing Brown's anticipated trial testimony in opening statement. Before jury empanelment, at a motion in limine hearing, the judge asked the prosecutor, "Is Mr. Brown going to be a witness in this case?" The Commonwealth replied that Brown would be brought into court and that his attorney had indicated that he would testify if called. But the prosecutor added, "Strategically, I don't know. . . . [H]e will be available to testify. I'm not promising him to the jury." In

his opening statement, the prosecutor did not promise the jury that Brown would be a witness or describe evidence that only Brown would have known.  But in defense counsel's opening statement, he declared:

> "You will hear from Gordon Brown during the course of this case, Gordon Kent Brown.  And Gordon Kent Brown has been in jail for a substantial period of time.  And in 1999 he had a parole hearing, and he was turned down for parole.  The police came to see Gordon Kent Brown shortly after he was turned down for parole and asked him about [the defendant], asked him if he knew where he was, wanted information about him, so that they could arrest [the defendant].  Mr. Brown's response to that was in the negative initially, but there was a second visit shortly after the first during which Mr. Brown began negotiations for [the defendant's] whereabouts.  That is, he wanted money in exchange for bringing information that he could provide him about [the defendant].

> "A year after the first parole hearing there was a second parole hearing.  Mr. Brown who had been turned down for parole previously wanted to get this parole this time, and, so, during the course of the parole hearing he agreed to assist the police, to help the government in this prosecution against [the defendant] who had by that time been arrested, and based at least in part upon the representations that he made, that he was going to help, he was granted parole.  At the time he was granted parole he knew [Richard] Paulsen's story.  He knew that [Richard] Paulsen had told the police that this was an armed robbery and not a drug deal, and he knew that he had to agree with that story in order to get parole.  And, so, he did."

At a sidebar conference after defense counsel's opening statement, the prosecutor stated, "I just want to be clear.  I never promised the jury Gordon Brown," and "on the record I said that I was -- I don't want to say ambivalent, but I didn't know whether I was going to call Mr. Brown."  The prosecutor asked

that the jury be reinstructed that opening statements are not evidence; the judge declined to do so.  Neither the Commonwealth nor defense counsel called Brown to testify during the course of trial.

At the evidentiary hearing on the motion for a new trial on October 5, 2018, defense counsel testified that he never intended to call Brown as a witness but expected from his experience as a defense attorney that the Commonwealth would call Brown to testify because Brown was on the witness list, had entered into a "plea agreement" with the Commonwealth, and was still in custody.  Based on his understanding of the research on opening statements "and the concepts of primacy and recency in persuading jurors," he wanted the jury to know of "Brown's baggage . . . from the get go, and not after he'd been introduced by the prosecutor," who, on direct examination, would make "an effort to diminish the import of what his prior life had been."  He conceded, "[H]indsight being 20/20, I might not have done that today."

"Where, as here, the defendant's ineffective assistance of counsel claim is based on a tactical or strategic decision, the test is whether the decision was 'manifestly unreasonable when made'" (quotation omitted).  Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017), quoting Commonwealth v. Acevedo, 446 Mass. 435, 442 (2006).  In making

this determination, we "focus on the point in time when counsel made the challenged strategic decision," not with the benefit of hindsight, and decide whether "lawyers of ordinary training and skill in the criminal law" would consider the strategic or tactical decision to be "competent" (citation omitted). Kolenovic, supra. "The manifestly unreasonable test, therefore, is essentially a search for rationality in counsel's strategic decisions, taking into account all the circumstances known or that should have been known to counsel in the exercise of his [or her] duty to provide effective representation to the client and not whether counsel could have made alternative choices." Id. at 674-675.

The thrust of the defense, as articulated by defense counsel in opening statement, was that "this was a drug deal gone bad during the course of which the gun was flashed, a struggle ensued, the gun went off accidentally, and [the victim] was killed." We conclude that, where defense counsel did not intend to call Brown as a witness, where the prosecutor earlier that day had told the judge in the presence of defense counsel that, strategically, he was not sure he would call Brown, and where the prosecutor did not tell the jury that Brown would testify or describe any evidence that only Brown could testify to, it was manifestly unreasonable to tell the jury that Brown would testify that what had occurred here was an armed robbery.

To be sure, if Brown were to have testified, it would have been reasonable for defense counsel to discuss Brown's anticipated testimony in opening statement and his motivation for giving that testimony with the goal of influencing the jury's first impression of the credibility of that testimony. But where the prosecutor had told the judge that he had yet to decide whether to call Brown, defense counsel relied on an informed guess as to whether Brown actually would testify. The risk of telling the jury that Brown would testify and corroborate Richard's version of events far exceeded the benefit of influencing the jury's first impression of Brown if he were to testify. No competent attorney would have taken this risk and made this choice.

Counsel's ineffective assistance, however, requires a new trial only if it created a substantial likelihood of a miscarriage of justice, that is, only if it was reasonably likely to have influenced the jury's conclusion. See Commonwealth v. Field, 477 Mass. 553, 556 (2017); Commonwealth v. Brown, 462 Mass. 620, 630 (2012). We conclude that it was not reasonably likely in this case. The overwhelming evidence at trial was that Richard and the victim thought this was to be a drug deal, but the defendant and Brown knew it was to be a drug "rip-off" (to steal the cash), i.e., an armed robbery. The only evidence that supported the defense theory that Richard or the victim had brought the firearm to the drug deal to conduct

their own drug rip-off to steal the drugs and that the victim was killed during a struggle over the gun came from the defendant's description of events to Nesbitt. That self-serving story, told to a distant cousin whose help the defendant sought while "on the lam," is inconsistent with Richard's testimony (and with his conduct immediately after the shooting), inconsistent with Weiss's testimony that the defendant brought a gun to the apartment, and inconsistent with the forensic evidence, which suggests that this was not a contact wound fired at close range, as one would expect if it were an accidental shooting during a struggle for the gun. Defense counsel's characterization of Brown's anticipated testimony was never mentioned again during the presentation of evidence at trial or in closing argument. In short, where the prosecutor had not decided to call Brown as a witness and defense counsel did not intend to, it was manifestly unreasonable for defense counsel in opening statement to have told the jury that Brown would characterize what happened as an armed robbery, but it reasonably could not have influenced the jury in reaching their verdict.

b. Promising to elicit from testifying police officers about "how drug deals are handled." In his opening statement, defense counsel told the jury:

> "There's an alternative scenario that we would suggest to you that this was in fact a drug deal . . . and through the cross-examination of the police officers we suggest that we will show you how drug deals are handled. The drugs and the money are not generally in the same place at the same time. And in this circumstance that a sample of drugs was taken to the premises, a gun was carried in order to protect the individual from people he didn't know that were supposedly buying from him, that this was a drug deal gone bad during the course of which the gun was flashed, a struggle ensued, the gun went off accidentally, and [the victim] was killed."

The defendant correctly notes that, at trial, defense counsel never did elicit during his cross-examination of the testifying police officers "how drug deals are handled," or that "[t]he drugs and the money are not generally in the same place at the same time" during a typical drug deal. Nor, pragmatically, could defense counsel have expected to elicit such testimony, where none of the testifying police officers had substantial experience investigating drug deals. But we need not dwell long on this claim of ineffective assistance because, in the context of this case, it amounts to nothing.

The Commonwealth's theory of this case, amply supported by Richard's testimony, was that this armed robbery occurred during what Richard and the victim intended to be a drug deal. Richard testified that he and the victim came to the apartment to buy drugs, and the defendant attempted to rob them of the money they had brought to pay for the drugs. There was no need for defense counsel to cross-examine the police officers to elicit from them

that this was meant to be a drug deal, because that was never in dispute. What was disputed is whether the defendant sought to negotiate a drug deal, as the defendant told Nesbitt in California, or whether the defendant simply used Richard and the victim's belief that they were going to purchase drugs from Brown as an opportunity for an armed robbery, as Richard testified. There is no risk that this assertion in opening statement, or defense counsel's failure to elicit the promised testimony, in any way influenced the jury's verdict.

    c. <u>Defense counsel's failure to visit the defendant in jail more than six times before trial</u>. Between the date of arraignment and the commencement of trial on May 8, 2001, defense counsel visited the defendant six times while he was in jail awaiting trial: on January 12, 2000; March 23, 2000; June 17, 2000; April 26, 2001; May 1, 2001; and May 2, 2001. The defendant also contends that he received discovery from defense counsel that counsel and the defendant never had the opportunity to discuss; that they did not agree about trial strategy; that he tried to telephone defense counsel numerous times between January 2000 and April 26, 2001, but was never able to speak with him; and that they never engaged in any written dialogue about the case. The defendant, however, has failed to articulate how his defense would have been materially different if defense counsel had visited him more often or been more

responsive to his attempts to contact defense counsel. At the close of the evidence at trial, the judge asked the defendant if he felt satisfied with defense counsel's representation of him; the defendant answered "yes." There is nothing in the defendant's briefs and nothing we can discern from the record that suggests that more or better communication between the defendant and defense counsel would have yielded anything likely to influence the jury's verdict in this case.

2. Retroactive application of Brown. The defendant argues that we should extend the reach of our holding in Brown to his case, even though we limited that holding to cases tried after the opinion was issued. In Brown, 477 Mass. at 807, we revised our common law of murder by declaring that, "in trials that commence[d] after the date of the opinion in [that] case," felony-murder would no longer be an independent theory of liability for murder but simply an aggravating element under G. L. c. 265, § 1, permitting a verdict of murder in the first degree where the jury found one of the three prongs of malice but did not find deliberate premeditation or extreme atrocity or cruelty. In doing so, we abandoned "the fiction of constructive malice -- that where a killing occurs in the commission of a felony, the intent to commit the felony is sufficient alone to establish malice." Id. at 825 (Gants, C.J., concurring). The defendant contends that, as a matter of due process, equal

protection, and basic fairness, we should extend our holding in Brown to his case, even though it was tried before our opinion in Brown and the appeal was pending when Brown was decided.  We have declined to do so in other cases.  See, e.g., Commonwealth v. Bin, 480 Mass. 665, 681 (2018); Commonwealth v. Phap Buth, 480 Mass. 113, 120, cert. denied, 139 S. Ct. 607 (2018).  We decline to do so here.

We made clear in Brown that "[f]elony-murder is a common-law crime"; we determine its elements.  Brown, 477 Mass. at 822. We declared that, in future trials, the element of malice would no longer be satisfied simply by proof of intent to commit the underlying crime:  one of the three prongs of malice would have to be proved.  Id. at 807.  This was not a clarification of existing common law; it constituted a change to our common law. Nor was it a change to our law of criminal procedure; it was a change to our substantive criminal law.  We made equally clear that our earlier felony-murder rule, which substituted the intent to commit the underlying felony for the malice required for murder, was not unconstitutional.  Id. at 823.  Our decision in Brown therefore did not announce a new constitutional rule. Id.

Because Brown neither established a new Federal constitutional rule nor a new Federal rule of criminal procedure, the United States Supreme Court precedent on which

the defendant relies is inapplicable.  See Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (Federal Constitution requires Federal and State courts to retroactively apply new Federal constitutional rules of criminal procedure to direct appeals from convictions); Commonwealth v. Waters, 400 Mass. 1006, 1007 (1987) ("Griffith does not require this court to give retroactive application to rules that are not based on the Federal Constitution").  Nor do Supreme Court precedents that provide that subsequent clarifications of existing substantive criminal law have retroactive effect apply here, because Brown clearly involved a change in the common law of felony-murder and not a mere clarification.  See Fiore v. White, 531 U.S. 225, 228-229 (2001) (because Pennsylvania Supreme Court "clarified" that crime of operating hazardous waste facility without permit did not apply to someone who had permit but deviated from its terms, defendant's conviction ran afoul of due process because defendant had permit and therefore never violated statute).  See also Bunkley v. Florida, 538 U.S. 835, 840 (2003) ("[t]he proper question under Fiore is not whether the law has changed," but rather what law required at time of defendant's conviction).  Thus, where we revise our substantive common law of murder, we are free to declare that our new substantive law shall be applied prospectively, much like the Legislature may do when it revises substantive criminal statutes.  See Commonwealth v.

Dagley, 442 Mass. 713, 721 n.10 (2004), cert. denied, 544 U.S. 930 (2005) ("When announcing a new common-law rule . . . there is no constitutional requirement that the new rule or new interpretation be applied retroactively, and we are therefore free to determine whether it should be applied only prospectively").  Cf. Commonwealth v. Galvin, 466 Mass. 286, 290 (2013), quoting G. L. c. 4, § 6, Second ("a newly enacted [penal] statute is presumptively prospective, and '[t]he repeal of a statute shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect'").

In fact, this case illustrates the wisdom of prospective application of our new common law of felony-murder.  The Commonwealth chose here to proceed on only one theory of murder in the first degree, felony-murder, which at the time of trial did not require the jury to find one of the three prongs of malice -- that is, that the defendant shot the victim with an intent to kill, or with an intent to cause grievous bodily harm, or intended to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result.  See Model Jury Instructions on Homicide 15-19 (1999).  Our decision in Brown would have permitted the Commonwealth to obtain a verdict of murder in the first degree on the theory of felony-murder, but only if the jury were to find one of the three prongs of malice.

See Model Jury Instructions on Homicide 59-60 (2018).  If we had applied our new common law of felony-murder retroactively, we would have been required to order a new trial in this case because the jury were not instructed that they had to find one of the three prongs of malice in order to find the defendant guilty of felony-murder in the first degree.  But this would have been unfair to the Commonwealth because, had the jury been so instructed, it likely would have found that the defendant acted with malice in shooting the victim, and that he did so during the commission of an attempted armed robbery, which would have resulted in a verdict of murder in the first degree on the theory of felony-murder.[6]

3.  Request for jury instruction on voluntary and involuntary manslaughter.  The defendant argues that the judge committed prejudicial error in declining the defendant's request that the jury be instructed on voluntary and involuntary manslaughter.  We agree that the judge erred, but we conclude that the error was not prejudicial in the context of his other instructions.

Although the Commonwealth proceeded solely on the theory of felony-murder, the judge, in accordance with our guidance at the

---

[6] The jury, had they been so instructed, might also have found the defendant guilty of murder in the first degree on the theory of deliberate premeditation.

time of trial, also instructed the jury regarding murder in the second degree, setting forth the three prongs of malice.[7]  Where an instruction was to be given regarding murder in the second degree based on a finding of malice, defense counsel asked for jury instructions regarding the lesser included offenses of voluntary and involuntary manslaughter.  "A manslaughter instruction is required if the evidence, considered in the light most favorable to a defendant, would permit a verdict of manslaughter . . . ."  Commonwealth v. Pina, 481 Mass. 413, 422 (2019).  Here, viewing the evidence in that most favorable light, a reasonable jury could have credited the defendant's description of what occurred as related to Nesbitt and concluded that the killing occurred after Richard or the victim displayed

---

[7] In Commonwealth v. Brown, 392 Mass. 632, 645 (1984), an appeal from a conviction of murder in the first degree on the theory of felony-murder, we held that "G. L. c. 265, § 1, requires a trial judge to instruct on murder in the first and second degrees if there is evidence of murder in the first degree, even though there appears to be no hypothesis in the evidence to support a verdict of murder in the second degree." See Commonwealth v. Dickerson, 372 Mass. 783, 795-796 (1977). Where the judge had denied that defendant's request for an instruction on murder in the second degree, we exercised our authority under G. L. c. 278, § 33E, to direct the entry of a verdict of murder in the second degree.  Brown, supra at 643-644.  However, in Commonwealth v. Paulding, 438 Mass. 1, 10 (2002), decided one year after the trial in the instant case, we changed course and held that a judge need not instruct the jury on murder in the second degree where the Commonwealth proceeds only on the theory of felony-murder and there is no evidence of malice that would support a verdict of murder in the second degree.

a gun while they were negotiating a drug deal and the victim either was accidentally killed during the struggle or shot in a heat of passion arising from reasonable provocation or sudden combat. Therefore, the judge erred in declining the defendant's request for these instructions.

Where the defendant requested such instructions and objected to their absence, we must determine whether the error was prejudicial. Pina, 481 Mass. at 422. "An error is not prejudicial only if the Commonwealth can show 'with fair assurance . . . that the judgment was not substantially swayed' by it." Commonwealth v. Rosado, 428 Mass. 76, 79 (1998), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). We conclude, with fair assurance, that the defendant suffered no prejudice from this error.

The judge instructed the jury that, to find the defendant guilty of murder in the first degree on the theory of felony-murder, they must find beyond a reasonable doubt that the defendant brought the gun to the room in the apartment where the brothers were waiting, took it and displayed it in a threatening way, and did so with the intent to rob Richard and the victim of the money they had brought. The judge also instructed that, to find the defendant guilty of murder in the second degree, they must find that he came into the room with a gun and intentionally pointed it at one of the brothers. The judge

further instructed that, to find the defendant guilty of murder in the first or second degree, the jury must find beyond a reasonable doubt that "there was an intentional act, that [the defendant] shot the gun, that it wasn't an accident," and "that he pulled the trigger intentionally."[8]  As a result, if the jury had a reasonable doubt whether the events had occurred as described by the defendant to Nesbitt (which itself is extraordinarily unlikely), they were required to find the defendant not guilty.  In view of these instructions and the feeble evidence supporting a finding of manslaughter, it is plain that the defendant was not prejudiced by the failure to instruct the jury regarding the law governing voluntary and involuntary manslaughter.

4.  Review under G. L. c. 278, § 33E.  As part of our plenary review, we have examined the record and conclude that a

---

[8] With respect to the charge of murder in the first degree on the theory of felony-murder, the accident instruction was far more favorable to the defendant than he was entitled to under the law.  See Commonwealth v. Brown, 477 Mass. 805, 831 (2017), cert. denied, 139 S. Ct. 54 (2018) (Gants, C.J., concurring) (under felony-murder rule "a defendant who participates in an armed robbery is guilty of felony-murder in the first degree if the defendant or an accomplice commits any act that results in death, even if the act is accidental and unintended"); Commonwealth v. Evans, 390 Mass. 144, 151-152 (1983) ("A defendant who kills a victim in the commission or attempted commission of a robbery, while the defendant is armed with a gun, is guilty of murder by application of the felony-murder rule. . . .  The fact that, according to the defendant, the gun was discharged accidently is of no consequence").

conviction of murder in the first degree is consonant with justice. We therefore decline the defendant's request to order a new trial or to reduce the verdict to murder in the second degree.

We specifically address only one claim of error that was not raised in the briefs but emerged in oral argument and was argued by the defendant in a letter submitted under Mass. R. A. P. 16 (l), as amended, 386 Mass. 1247 (1982): that the judge erred in failing to give an instruction on felony-murder in the second degree, based on the uncharged offenses of (1) conspiracy to violate the drug laws, G. L. c. 94C, § 40; (2) unlicensed carrying of a firearm, G. L. c. 269, § 10 (a); and (3) armed assault with intent to rob, G. L. c. 265, § 18.

We have previously held "that the felony on which a charge of felony-murder is premised may be uncharged, so long as the evidence supports it." Commonwealth v. Stokes, 460 Mass. 311, 315 (2011). The defendant is correct that the evidence would support at least the last two of the three uncharged felonies he identifies. "But where the felony later advanced by a defendant as the predicate for an instruction on felony-murder in the second degree is not itself the subject of a separate indictment, no error occurs if the trial judge does not charge the jury on it even though there may be sufficient evidence supporting such a charge -- at least where, as here, no party

requested such an instruction or even brought the issue to the judge's attention at trial." Id. We reasoned:

> "A contrary rule has an obvious potential to undermine the policy of finality of criminal convictions. It is likely that in almost every case where a defendant has been convicted of felony-murder in the first degree predicated on a felony punishable by life imprisonment, an argument can later be made that the trial evidence also supported the existence of one or more uncharged felonies not punishable by life imprisonment, and that therefore the jury should have been instructed on felony-murder in the second degree. Limiting the availability of such a claim to cases where the felony later advanced as presenting a basis for a charge of felony-murder in the second degree was the subject of a separate indictment may strike an appropriate balance. The existence of the indictment puts the Commonwealth (as well as the trial judge) on notice that at least there is a theoretical possibility of conviction of felony-murder in the second degree."

Id. at 316. Applying that reasoning here, we conclude that there was no error. Nor do we find a substantial likelihood of a miscarriage of justice arising from the absence of an instruction regarding felony-murder in the second degree premised on other felonies that were not punishable by life in prison. The overwhelming evidence in this case was that the defendant committed an attempted armed robbery.

Conclusion. We affirm the defendant's conviction of felony-murder in the first degree and the denial of his motion for a new trial.

So ordered.