SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. EPSHOD JEUNE

 
 Docket:
 SJC-13447
 
 
 Dates:
 April 5, 2024 – October 18, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, & Wendlandt, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Homicide. Felony-Murder Rule. Robbery. Home Invasion. Armed Assault in a Dwelling. Firearms. Practice, Criminal, Jury and jurors, Instructions to jury, Capital case. Evidence, Identification, Accident. Jury and Jurors. Malice. Identification. License. Constitutional Law, Right to bear arms.
 
 

       Indictments found and returned in the
Superior Court Department on August 15, 2015.
      The cases were tried before Bruce R.
Henry, J.
      Steven J. Rappaport for the defendant.
      Christa Elliott, Assistant District
Attorney, for the Commonwealth.
      GAZIANO, J.  On the night of July 1, 2015, the defendant,
Epshod Jeune, and his accomplice, Derrell Fisher, robbed or attempted to rob
three women working as escorts at three separate hotels.  The defendant contacted each woman by calling
a telephone number advertised on a website (Backpage).  The first woman denied them entry to her
room.  The second woman was robbed at
gunpoint.  The third woman was shot and
killed.  After the defendant and Fisher
were tried jointly, a jury convicted both of them of murder in the first degree
based on a theory of felony-murder, among other charges.
      In this direct appeal, the defendant contends
that he is entitled to a new trial for the following reasons:  the judge erred in dismissing two Black
jurors for cause; a police officer improperly identified the defendant in a
video recording at trial; the judge's instructions to the jury on third prong
malice were erroneous; and the judge failed to provide a requested accident
instruction.  The defendant also asserts
that his conviction of unlawful possession of a firearm must be vacated in
accordance with our holding in Commonwealth v. Guardado, 491 Mass. 666, 693
(Guardado I), S.C., 493 Mass. 1, 12 (2023) (Guardado II), cert. denied, 144 S.
Ct. 2683 (2024).  Finally, pursuant to
G. L. c. 278, § 33E, the defendant asks this court to reduce his
murder conviction to involuntary manslaughter.[1]
      We agree with the defendant that his
conviction of unlawful possession of a firearm must be vacated.  We conclude, however, that there was no
prejudicial error requiring reversal of the remaining charges, and that the
defendant is not entitled to a reduction in his sentence under G. L.
c. 278, § 33E.[2]
      1. 
Background.  a.  Facts. 
We recite the facts that the jury could reasonably have found, reserving
certain facts for later discussion.  See
Commonwealth v. Tyler, 493 Mass. 752, 754 (2024).
      i. 
The crimes.  From the evening of
July 1, 2015, to the early morning hours of July 2, 2015, the defendant and
Fisher traveled to three different hotels to rob three different women:  Sarah,[3] Emily,[4] and Sanisha Johnson.  The defendant found each woman through her
advertisement for escort services on Backpage and posed as a customer to
arrange a meeting with each of the three women.
      The defendant and Fisher first targeted
Sarah.  On July 1, Sarah was staying at a
hotel in Saugus (Saugus hotel).  Around
11 P.M., she received a telephone call from the defendant regarding her
availability and the prices for her services. 
Sarah sent text messages to the defendant containing the address of the
Saugus hotel and instructions to call her on his arrival.  The defendant later called Sarah, who
provided her room number.
      A security camera at the Saugus hotel
recorded a light-colored Toyota Camry arriving at the hotel that night at
approximately 11:30 P.M.  The Camry's
gasoline cap cover and front right quarter panel appeared to be different
colors from the Camry's body, and its left rear hubcap was missing.[5]  Further footage depicted Fisher walking
through the front entrance of the hotel minutes after the Camry arrived.  Fisher entered a hotel hallway and opened an
exterior door, allowing a second man into the hotel.  This second man was wearing a dark-colored
hooded sweatshirt, a hat with stickers on the brim, dark-colored jeans, and
dark-colored footwear.
      After allowing the second man into the
hotel, Fisher approached Sarah's hotel room and knocked on the door.  Sarah looked through the peephole and
observed Fisher on the other side of the door. 
Sarah said, "I'm sorry, but I don't do [B]lack guys."  Fisher responded that he was Spanish, not
Black.  Nonetheless, Sarah testified at
trial that "[h]e just didn't look right to [her]," and she did not
answer the door.  Fisher and the second
man then left the hotel through a side door.[6]
      The defendant and Fisher next sought out
Emily.  Although Emily lived in West Palm
Beach, Florida, she was staying at a hotel in Woburn (Woburn hotel) on the
night of July 1.  Like Sarah, Emily was
contacted by the defendant via text message that evening at around 10:40 P.M.  The defendant booked an appointment with
Emily for her services that evening. 
Between 10:40 P.M. and 11:53 P.M., Emily continued to exchange text
messages with the defendant to confirm where she was located, including her
room number; the prices for her services; and the time of the defendant's
arrival.
      As seen on surveillance footage recorded
that night at the Woburn hotel, a light-colored Camry missing its left rear
hubcap pulled into the hotel's parking lot at around 11:50 P.M.  After the Camry parked, the same man who had
been seen with Fisher at the Saugus hotel entered the lobby of the Woburn hotel
wearing a hat with an "'A's' logo" on it.  This man approached a side door of the hotel,
opened it, and peered outside a few times. 
He propped the side door open and exited through the lobby entrance
while using his cell phone.  Moments
later, this man and Fisher walked through the parking lot together and entered
the hotel through the propped-open side door.
      At 11:53 P.M., Emily sent a text message
with her room number to the defendant. 
Shortly after, she heard a knock on her door.  Emily looked through the peephole and saw
Fisher.  Once Emily opened the door, a
second man, by inference the defendant, barged into her room.  Emily testified that this person was a
stocky, medium-toned Black man wearing a gray hooded sweatshirt.  She also testified that this man was roughly
her height -- five feet, four inches tall.[7] 
She did not recall seeing facial hair or any tattoos on his fingers.[8]  The defendant grabbed the bottom part of
Emily's face and pushed her into a closet and against its back wall.  After pulling out a gun and placing it
against Emily's forehead, the defendant stated, "If you scream, believe
me, I can scream louder.  Where da money
at?  I'm not playin'.  Where da money at?"
      Emily agreed to give the two men her money
and went to a nearby dresser to retrieve her purse.  Emily's purse contained not only her wallet
but also various cards for herself and her children, including medical cards,
Social Security cards, and an identification card, as well as receipts from
stores in West Palm Beach.  The dresser
also contained approximately "five joints worth" of marijuana.  After getting her purse from the dresser
drawer, Emily recalled that she had hidden $700 elsewhere in the room and
informed the men.  As Emily began to
reach underneath the end table for the hidden money, the defendant, continuing
to aim the gun at Emily, moved her away and instructed Fisher to take the
hidden cash, which he did.  Fisher also
looked through Emily's purse, which contained her wallet.
      The defendant told Emily to get on the
floor by the foot of the bed closest to the window.  In response to the defendant's instruction to
search the room, Fisher began ransacking the area.  After Fisher's search was complete and as
both men were leaving the hotel room, the defendant told Emily, "I'll get
back at you.  I'm gonna holler at
you."  The whole encounter lasted
from three to four minutes.  At 12:05
A.M. on July 2, the two men exited the hotel through the same side door they
had entered and proceeded to drive away in the Camry.
      Around the same time, Johnson was staying
at a hotel in Burlington (Burlington hotel). 
Like the other two women, Johnson also had been communicating with the
defendant and scheduled an appointment for that evening.
      Around 12:14 A.M. on July 2, security
footage from a nearby business recorded a light-colored Camry entering the
Burlington hotel's parking lot.  Minutes
later, Fisher walked into the Burlington hotel through the front door.  As he walked through the lobby, Fisher
appeared to be using his cell phone.
      Soon after, as depicted on the Burlington
hotel's security footage, the same man who accompanied Fisher on the two prior
outings to the Saugus and Woburn hotels, entered a side door of the hotel.  This man, by inference the defendant, was
wearing dark pants and a dark hooded sweatshirt, with the hood pulled up over
his head.  The hotel security footage
shows that once inside, he waited a few seconds at an internal door leading to
a hallway and then entered.  Minutes
later, at around 12:23 A.M., both men ran through the internal hallway door and
out the external side door.  The Camry was
then driven from the hotel parking lot with its headlights off until it turned
onto the street shortly afterward.
      Between the times that the two men arrived
at and departed from the Burlington hotel, guests staying near Johnson's hotel
room reported to police that they heard screams and a gunshot.  Two guests in an adjacent room recalled
hearing a woman call out, "Help me, help me," followed by a loud
bang.  Another guest similarly reported
hearing a woman scream, "Somebody help me, please," and then a loud
bang.  Additionally, an overnight
employee of the Burlington hotel, who independently heard a loud bang, received
two telephone calls from guests regarding the sound of gun shots.  After answering the second telephone call,
the overnight employee called the police.
      Robert Dingess, a long-term guest who had
been staying for several months at the Burlington hotel, was among the guests
who had heard a gunshot.  During his
stay, Dingess came to know the defendant, who was employed at the Burlington
hotel around the time of the shooting. 
They exchanged several text messages over the course of Dingess's
extended stay and saw each other nearly daily. 
Dingess also bought marijuana from the defendant.
      At 1:33 A.M., just over one hour after the
two individuals fled through the side door of the Burlington hotel, Dingess
received a text message from the defendant. 
The defendant asked Dingess what had happened at the hotel, and Dingess
explained to the defendant that someone had heard a woman scream, followed by a
gunshot.  The defendant asked Dingess if
anyone from any news stations had arrived so he could "katch [sic]
anything" on the news.  Dingess
replied that no one had arrived. 
Unprompted, Dingess sent a text message to the defendant at about 3 A.M.
to notify him that someone had been found dead at the hotel.  The defendant responded minutes later via
text message, requesting that Dingess delete the defendant's cell phone number
and messages between the two.  The
defendant, at about 5 A.M., provided an alternative telephone number for
Dingess to use to contact him.
      ii. 
The investigation.  At around
12:30 A.M. on July 2, in response to a radio call, officers from the Burlington
police department arrived at the Burlington hotel, where they discovered
Johnson's body in her hotel room.  One
officer observed an injury to Johnson's torso that he believed to be a
potential gunshot wound.  A medical
examiner later confirmed Johnson's cause of death was a gunshot wound to her
torso caused by a .38 caliber projectile.
      After officers obtained statements from
hotel guests, they spoke with the overnight employee at the front desk.  This employee gave one of the officers a
wallet that had been turned in earlier that morning to the hotel's lost and
found.  Later that morning, the officer
inspected the contents of the wallet, finding, among other items, a receipt
from a variety store in West Palm Beach.
      On the evening of July 3, Emily contacted
the police after seeing coverage of the Burlington hotel incident on
television.  The next day, officers
traveled to where Emily was staying to speak with her in person.  The officers then drove Emily to the police
station, where she was asked to identify the men who robbed her.  From a photographic array, Emily selected one
photograph stating that while she was "[p]retty sure" that the
photograph depicted the man who robbed her, as he had the "same
features," she was "[n]ot positive."  The photograph Emily selected was not that of
the defendant, despite the defendant's photograph being included in the array.
      Sometime later, another officer sent a
text message to Emily containing photographs of the receipt and wallet that had
been turned in at the Burlington hotel's lost and found.  Emily responded that the receipt was from a
store she frequented in Florida and confirmed that the wallet was hers.
      On July 2, 2015, State Police Trooper Sean
O'Brien retrieved security video footage from the Burlington hotel.  During his visit to the Burlington hotel, he
observed a nearby building with a security camera that recorded the entrance
and exit of the Burlington hotel and retrieved video footage from this camera
as well.  O'Brien viewed these videos
dozens of times.  O'Brien later traveled
to both the Woburn hotel and the Saugus hotel to obtain and view further
security footage.
      Based on a review of telephone records and
other information, O'Brien and another officer drove by the defendant's
residence in Burlington on the morning of July 3.  As they approached the residence, the
officers observed a light-colored four-door Camry, which was missing its left
rear hubcap and had a dark front right quarter panel, parked in the
driveway.  O'Brien recognized the car as
the same vehicle in the surveillance videos he had viewed.  While the officers were setting up their
surveillance on a nearby street, the defendant's Camry left the driveway.  The officers were notified later that evening
that the Camry was spotted at a fast-food restaurant in Winchester.  After traveling to the restaurant, the
officers found the defendant's Camry parked adjacent to the drive-through
window.  When the officers approached the
vehicle, they discovered the defendant and Fisher inside, with a third man
sitting in the back seat.
      O'Brien informed the defendant, who was in
the driver's seat, that he was not under arrest and requested that he step out
of the vehicle to speak.  O'Brien asked
the defendant where he was on the night of July 1, and the defendant answered
that he was with his girlfriend in Roxbury from 10 P.M. to 7 A.M. the next
morning.  The defendant declined to
provide a name or address for his girlfriend. 
The defendant also asserted that he was the only one with keys to his
Camry and that on the night of July 1, no one else had used this car, which was
parked at his girlfriend's residence.
      Based on its similar appearance to the
vehicle in the surveillance footage, the defendant's Camry was seized as
evidence.  When police later executed a
warrant to search the Camry, they found the defendant's Alcatel brand cell
phone (with an assigned telephone number matching the alternative number that
the defendant had provided Dingess); a bag of marijuana; and a hotel room card
and a hotel employee nametag bearing the defendant's nickname, Remy, both
bearing the same hotel name as the Burlington hotel.
      After searching the defendant's Alcatel
cell phone pursuant to a warrant, police discovered that the cell phone had
accessed Backpage's escort section 199 times and had been used to view Sarah's,
Emily's, and Johnson's advertisements on the evening of July 1.  Approximately one hour after Johnson's body
was discovered by police, this cell phone was used to check for breaking
news.  The cell phone also was used to
monitor various online news outlets throughout the afternoon of July 2 and over
the following days for articles concerning the shooting death of the victim at
the Burlington hotel.
      The defendant further used his cell phone
to stay in frequent contact with Fisher throughout the day on July 2,
exchanging several calls and text messages. 
Among the exchanges, the defendant sent a text message to Fisher on the
afternoon of July 2 that stated: 
"Ima kall u in a min.  Its on
da news."  The defendant also
repeatedly called and sent text messages to the mother of his child from the same
cell phone, referencing news coverage of the murder.  As in his interactions with Dingess, the
defendant requested she delete his text messages and calls.
      Police obtained a warrant allowing them to
access cell phone records containing location data associated with the
defendant's cell phone numbers.  These
records reveal that one of the defendant's cell phones activated towers in
Saugus, Woburn, and Burlington on the night of July 1 and in the early morning
of July 2 at the times the cell phone was being used to communicate with Sarah,
Emily, and Johnson, respectively.
      Police additionally secured a warrant
authorizing a search of the defendant's residence.  On July 4, after arriving at the defendant's
residence, one officer observed a blue Jeep Cherokee sport utility vehicle with
a flat tire in the driveway.  The vehicle
did not have any license plates. 
However, it did have an inspection sticker on the windshield with a
license plate number that matched the license plate number affixed to the
defendant's Camry.  Officers later
confirmed that the blue Jeep was registered to the defendant.
      The officer searched the blue Jeep.  Underneath a blanket on the front passenger
seat, the officer discovered various cards, each bearing either Emily's name or
the name of one of her family members, including Social Security cards, health
care cards, a debit card, an identification card, and a business card.  Emily later verified that these cards
belonged to her.  The officer continued
to search the vehicle and noticed an unzipped black backpack on the rear seat
of the driver's side.  Within this
backpack was a clear plastic bag containing .38 caliber ammunition -- the same
caliber of the projectile recovered from Johnson's body.  When the officers searched the defendant's
home, they found a box for an Alcatel cell phone, an "Oakland A's"
hat similar to the hat the second man was wearing in the security footage, and
a hotel key card exhibiting the same hotel name as the Burlington hotel.
      b. 
Procedural history.  On August 15,
2015, a grand jury indicted the defendant for (1) murder in the first degree in
violation of G. L. c. 265, § 1; (2) attempted armed robbery of
Johnson in violation of G. L. c. 274, § 6; (3) unlawful
possession of a firearm in violation of G. L. c. 269,
§ 10 (a); (4) armed robbery of Emily in violation of G. L.
c. 265, § 17; (5) home invasion of Emily in violation of G. L.
c. 265, § 18C; and (6) armed assault in the dwelling of Emily in
violation of G. L. c. 265, § 18A.
      In November 2017, the defendant and Fisher
were tried jointly before a jury.  The
jury convicted the defendant on each indictment.  For the charge of murder in the first degree,
the jury found the defendant guilty on a theory of felony-murder, with attempted
armed robbery as the predicate offense.
      The defendant timely appealed from his
convictions to this court.
      2. 
Discussion.  a.  Juror dismissal.  The defendant argues that the trial judge's
dismissal of two Black jurors -- juror nos. 14 and 65 -- for cause resulted in
structural error.  The Commonwealth
contends that it was not an error to dismiss either juror where the record
illustrates that the judge had legitimate concerns about each juror's ability
to comprehend the legal proceedings.  Both parties acknowledge that this is an
identical issue to the one presented and rejected by this court in Commonwealth
v. Fisher, 492 Mass. 823, 842-849 (2023). 
We conclude there is no reason to depart from our prior holding.
      During a voir dire examination of juror
no. 14, the juror was asked about the presumption of innocence and
responded:  "I do not exactly know
what [presumption of innocence] means, so I don't think I really have a
position here.  It's sad."  The Commonwealth asked the juror if she would
be "able to look at each defendant individually and determine on the
evidence whether the case is proved against them beyond a reasonable
doubt."  The juror responded,
"Um, I do not know.  No?"  Juror no. 65 expressed a concern that her
language abilities could make it difficult for her to be a juror, as English
was not her first language.  When the
trial judge inquired into her answers to the juror questionnaire, it became
apparent that the juror had misunderstood some of the questions.  For instance, although the juror indicated on
the questionnaire that she knew someone from the district attorney's office for
Middlesex County, she told the judge that she did not know anyone from that
office.  Both jurors were excused for
cause.[9]
      We review a judge's dismissal of jurors
for an abuse of discretion.  Fisher, 492
Mass. at 846, citing Commonwealth v. Grier, 490 Mass. 455, 467 (2022).  Absent a judge's "'clear error of
judgment in weighing' the factors relevant to the decision . . . such
that the decision falls outside the range of reasonable alternatives," we
must uphold the judge's decision.  L.L.
v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  A judge must ensure that jurors can
"fairly evaluate the evidence and apply the judge's instructions on the
law."  Commonwealth v. Williams, 481
Mass. 443, 453 (2019).  Key to these
concerns is whether a juror comprehends the proceedings.  See Grier, supra at 468 (lack of candor and
lack of comprehension are "both . . . legitimate reasons to
doubt the juror's suitability to serve"). 
See also G. L. c. 234A, § 67A (where judge, on
examination of juror, finds juror does not understand certain core concepts of
criminal trial, including presumption of innocence, "another juror shall
be called in").
      As we pointed out in Fisher, 492 Mass. at
848, both jurors "gave answers that illustrated their lack of
comprehension, despite both of their seemingly genuine efforts to
understand."  Because lack of comprehension
is a "legitimate reason[] to doubt [a] juror's suitability to serve,"
the dismissal of these jurors was not an abuse of discretion.  Grier, 490 Mass. at 468.  See Fisher, supra.
      b. 
O'Brien's identification of the defendant.  The defendant next argues that he was
prejudiced by the erroneous admission of O'Brien's identification of the
defendant in the surveillance footage. 
O'Brien testified at trial that, based on a video of the defendant at
work as well as the Woburn and Burlington hotels' security footage, he believed
that the second person accompanying Fisher in all three hotel security videos
was the defendant.  We conclude, as we
did in Fisher, 492 Mass. at 851, that while the identification was admitted in
error, it did not result in prejudice that requires us to reverse the
defendant's conviction.
      Prior to trial, the defendant moved to
exclude lay opinion testimony regarding the identity of persons in the
surveillance videos from the three hotels. 
In his motion, the defendant argued that this case did not "present
the unique circumstance in which witnesses have been allowed to offer lay
opinions concerning the identity of persons in photographs and videos,"
such as poor image quality, officer familiarity with the defendant, and changes
in the appearance of the defendant at trial. 
The Commonwealth opposed the motion and filed its own motion seeking to
allow the testimony.  Ultimately, the
judge allowed the Commonwealth's motion in part, writing in a margin
endorsement:
"ALLOWED as
to one witness (Trooper O'Brien).  I have
reviewed the videos in question and find they are generally of good quality,
but neither unmistakably clear nor hopelessly obscure.  The appearances of the defendants as they
will be seen in court are different than the appearances of the persons in the
videos, where hats and hooded sweatshirts obscure some of the features.  One of the defendants is wearing glasses in
court and it is not clear that the persons in the video[s] are wearing glasses.  Finally, the Trooper's familiarity with the
defendants based on his investigation of this matter is a factor weighing in
favor of the admissibility of such an identification."
      At trial, O'Brien testified to several key
facts about the investigation, including his review of the various surveillance
video recordings.  O'Brien explained to
the jury that he had viewed these videos "[m]ultiple times, dozens and
dozens of times."  Discussing the
hotel surveillance videos collectively, O'Brien testified that he believed the
same two men were depicted in all three videos. 
He identified one man as Fisher and the other as the defendant.  O'Brien further noted that the man he
believed to be the defendant was wearing a dark sweatshirt with a hood, dark-colored
jeans, and dark footwear consistently in the surveillance videos from each of
the three hotels.  O'Brien also observed
that a video of the defendant working showed the defendant's
"distinctive" gait.  According
to O'Brien, this matched the gait of the second man in the security footage
from the Saugus and Woburn hotels, who "walked . . . almost with
his toes in a pointed outward direction."
      The defendant objected to O'Brien's
identification at trial, and we therefore review the admission of O'Brien's
testimony identifying the defendant for prejudicial error.  Fisher, 492 Mass. at 850.  In Fisher, we explained that
"identifying a person from a video image is admissible only where the
subject matter to which the testimony relates cannot be reproduced or described
to the jury precisely as it appeared to the witness at the time"
(quotations omitted).  Id., quoting
Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019).  We held that it was error to allow O'Brien to
identify Fisher in the surveillance footage, reasoning that the jury could view
for themselves the surveillance footage and other photographs of Fisher taken
close in time to the night of Johnson's death, there was no indication that
Fisher's appearance changed substantially from the time of the recordings to
the time of trial, and O'Brien lacked sufficient familiarity with Fisher.  See Fisher, supra at 851.
      We next examined whether this error
resulted in prejudice.  As we explained,
we previously have determined that "no prejudice existed in specific
circumstances where the evidence against the defendant was strong, where the
identification was fleeting, or where the defendant admitted to being present
at the scene."  Fisher, 492 Mass. at
851.  In concluding that Fisher was not
prejudiced, we reasoned that although Fisher did not admit to being at the scene,
the evidence against Fisher was strong. 
Id. at 852.  This included
Fisher's physical similarity to the man in the video footage, his presence in
the defendant's car on the day after the shooting, his lies to officers about
his whereabouts at the time of the crimes, the incriminating text messages
between Fisher and the defendant, and the cell site location information
placing Fisher in Boston before and after the murder.  Id.  We
further noted that "most impactful" to our determination were the
judge's "several forceful instructions regarding O'Brien's
identification."  Id. at 853.  We determined that "[t]his evidence,
connected with the abundance of evidence against [the defendant], [Fisher's]
joint venturer, support[ed] our conclusion" that there was no
prejudice.  Id. at 852.
      The same reasoning applies here with
equal, if not greater, force.  It was an
error to admit O'Brien's identification of the defendant where the jury could
directly view the security footage and arrive at their own conclusions about
the appearance and gait of the man that O'Brien identified as the
defendant.  Additionally, O'Brien lacked
familiarity with the defendant and there was no evidence of any marked changes
in the defendant's appearance between the night of the murder and the time of
the trial.  Nonetheless, the improper
testimony was not prejudicial to the defendant.
      The evidence of the defendant's role as an
active participant in the fatal robbery is even more compelling than the
evidence against Fisher.  Introduced in
evidence were photographs of the defendant that had been taken close in time to
the night of the murder, including photographs of the defendant found on his
Alcatel cell phone, photographs documenting the defendant's encounter with the
police at the fast-food restaurant the day after the shooting, and a booking
photograph of the defendant.  These
photographs provided an independent source from which the jury could determine
if the defendant was the man present in the security footage.  The defendant's cell phone records further
revealed that the defendant was present in Burlington, Saugus, and Woburn
during the night of July 1 and the early hours of July 2; had accessed each of
the three women's Backpage advertisements; sent text messages to each woman to
arrange a meeting; communicated with Dingess requesting information about the
shooting one hour after the two men had fled the Burlington hotel; and
repeatedly searched for news of a shooting death at a hotel in Burlington hours
after Johnson was killed.  Additionally,
visible in each of the hotel surveillance videos is a light-colored Camry with
unique features matching the car registered to the defendant and found at his
residence.  In another vehicle registered
to the defendant, bullets matching the caliber of the projectile that killed
Johnson were discovered, along with several identification cards belonging to
Emily that were taken from her possession on the evening of July 1.  The strength of this collective evidence,
which was properly admitted, weighs against a determination of prejudice.  See Commonwealth v. Vacher, 469 Mass. 425,
442 (2014) ("The testimony . . . did not overwhelm the other
compelling, properly admitted evidence against the defendant");
Commonwealth v. Austin, 421 Mass. 357, 366 (1995) ("The evidence pointing
to the defendant was overwhelming and the officer's testimony was merely
cumulative of other identification evidence properly admitted against the
defendant").
      Next, the trial judge made "several
forceful instructions regarding O'Brien's identification of the defendant on
the video recording."  Fisher, 492
Mass. at 853.  One instruction was
contemporaneous with O'Brien's testimony and two additional instructions were
given after the close of evidence.  In
each instruction, the judge explicitly mentioned O'Brien's name and emphasized
that it was the jury's "determination and [their] determination
alone" regarding the identity of the perpetrators.  Because we presume that the jury follows the
judge's instructions, this further weighs against a finding of prejudice.  See Commonwealth v. Andrade, 468 Mass. 543,
549 (2014).
      Based on the strength of the properly
admitted evidence linking the defendant to the crimes and the trial judge's
repeated instructions, we hold that this error did not prejudice the defendant.
      c. 
Erroneous jury instruction. 
Before the defendant was tried, we decided Commonwealth v. Brown, 477
Mass. 805, 807 (2017), cert. denied, 139 S. Ct. 54 (2018), in which we "[did]
away with constructive malice and abolish[ed] felony-murder as an 'independent
theory of liability for murder'" (citation omitted).  Tyler, 493 Mass. at 759.  The Commonwealth therefore needed to prove
actual malice -- i.e., that the defendant either "intended to kill or to
cause grievous bodily harm, or intended to do an act which, in the
circumstances known to the defendant, a reasonable person would have known
created a plain and strong likelihood that death would result."  Brown, supra at 825 (Gants, C.J., concurring).
      The trial judge instructed the jury that
to find the defendant guilty of felony-murder, the Commonwealth was required to
"prove
beyond a reasonable doubt that the defendants knowingly participated in the
commission of the underlying felony, here an attempted armed robbery, that he
did so with the intent required to commit the underlying crime, and that he had
or shared the intent to kill, the intent to cause grievous bodily harm, or the
intent to do an act which in the circumstances known to him a reasonable person
would have known created a plain and strong likelihood that death would
result."
      During deliberations, the jury asked for
clarification whether "[i]ntended to do an act" meant "attempted
armed robbery or the discharge of a firearm."  The trial judge answered the jury, over the
defendant's objection, as follows:  
"You must
determine separately for each defendant from the totality of the circumstances
which you find occurred whether what occurred constitutes an intent to do an act
which in the circumstances known to the defendant a reasonable person would
have known created a plain and strong likelihood that death would occur."
The
defendant argues that the instructions the trial judge provided ran afoul of
Brown and "permitted the jury to find the defendant guilty of murder based
upon constructive malice for merely acting as a participant in an attempted
armed robbery."  He maintains that
the judge should have instructed the jury to "focus . . . on the
defendant's intent at 'the moment of the discharge of the firearm.'"  Because the defendant objected to these
instructions at trial, we review for prejudicial error.  See Commonwealth v. Odgren, 483 Mass. 41, 46
(2019).
We
considered the same challenge to the same jury instructions in Fisher, 492
Mass. at 861.  We concluded that the
judge's instructions were consistent with Brown, 477 Mass. at 832, and
comported with the model jury instructions, and that the evidence supported the
jury's finding of malice.  Fisher, supra
at 861-863.  We explained that for
purposes of third prong malice, the "act," which we left undefined in
Brown, "could be the shooting of a gun," but "could also
reasonably be the commission of a dangerous attempted armed robbery, which a
reasonable person would have known created a plain and strong likelihood that
death would occur."  Fisher, supra
at 862.  As we previously held, there was
no error in these jury instructions.
d.  Accident instruction.  The defendant further argues that the trial
judge erred in denying a requested accident instruction as a defense to the
murder charge based on the theory that the shot that killed Johnson
accidentally was discharged.  See
Commonwealth v. Zezima, 387 Mass. 748, 756 (1982).  Where a defendant objects, as he did here, we
review for prejudicial error. 
Commonwealth v. Pina, 481 Mass. 413, 417-418 (2019).
"A
defendant is entitled to an accident instruction in a shooting death 'only
where there is evidence of an unintentional or accidental discharge of a
firearm.'"  Pina, 481 Mass. at 418,
quoting Commonwealth v. Millyan, 399 Mass. 171, 182 (1987).  The defendant argues that the "issue of
accident was fairly raised on the facts of the case" but points to no
evidence presented at trial.  As we noted
in Fisher, 492 Mass. at 863 n.43, "[i]n the absence of any evidence that
the murder of Johnson was an accident, the defendant was not entitled to an
instruction on accident."  Because
there was no evidence demonstrating that the defendant was entitled to an
accident instruction, the judge did not err in denying this requested
instruction.
e.  Firearm conviction.  The defendant was found guilty of unlawful
possession of a firearm in violation of G. L. c. 269,
§ 10 (a).  There was no
instruction at trial that required the Commonwealth to prove, as an essential
element of the crime, that the defendant lacked a firearms license, and no such
evidence was presented at trial.  The
defendant's Second Amendment and due process rights were therefore violated.  See Guardado I, 491 Mass. at 693.  As the Commonwealth concedes, the proper
remedy for this error is to remand for a new trial on that charge.  See Guardado II, 493 Mass. at 6.  We therefore vacate the defendant's
conviction of unlawful possession of a firearm and remand for a new trial on
that charge.  See Commonwealth v. Gibson,
492 Mass. 559, 579 (2023).
f.  Review under G. L. c. 278,
§ 33E.  Finally, with respect to the
defendant's conviction of murder in the first degree, the defendant asks this
court to direct the entry of a verdict of a lesser degree of guilt --
involuntary manslaughter -- pursuant to G. L. c. 278,
§ 33E.  After reviewing the entire
record, we decline to do so.
3.  Conclusion. 
We vacate the judgment convicting the defendant of unlawful possession
of a firearm, set aside that verdict, and remand the case to the Superior Court
to allow for a new trial on that charge. 
We further vacate the judgment convicting the defendant of attempted
armed robbery as duplicative and affirm the remaining judgments.
So ordered.

footnotes

[1] The defendant
advances several arguments that largely mirror those raised on appeal by
Fisher, whose convictions we recently affirmed. 
See Commonwealth v. Fisher, 492 Mass. 823 (2023).

[2] As the
Commonwealth concedes, the defendant's conviction of attempted armed robbery is
a lesser included offense that is duplicative of the defendant's felony-murder
conviction.  See Commonwealth v. Tyler,
493 Mass. 752, 757 n.4 (2024).  Because a
defendant "cannot simultaneously be convicted of a crime and of its lesser
included offense," we vacate the defendant's conviction of attempted armed
robbery.  Commonwealth v. Rivera, 445
Mass. 119, 132 (2005).

[3] A pseudonym.

[4] A pseudonym.

[5] Police later
learned that a light-colored four-door Camry, missing its left rear hubcap and
with a dark front right quarter panel, was registered to the defendant.

[6] The defendant
was not charged with the attempted robbery of Sarah.  The trial judge instructed the jury that
evidence of this first incident was to be used "only for the limited
purpose of determining the issues of motive, knowledge, state of mind, intent,
plan, pattern of operation, common scheme or modus operandi, the absence of
accident or a mistake, or the possession of instrumentalities capable of
inflicting injury and identity."

[7] Emily also
testified that the two men were about the same height.  Fisher is approximately six feet tall.

[8] At the time
of his booking, the defendant had facial hair and distinctive tattoos on his
hands.

[9] The defendant
objected to the dismissal of juror no. 65 but acknowledges that he withdrew an
objection to the dismissal of juror no. 14. 
However, he asserts that because Fisher also objected to juror no. 14's
dismissal and did not withdraw his objection, the objection was preserved for
each party.  See Commonwealth v. Bookman,
492 Mass. 396, 398 (2023).  Because we
conclude no error resulted from the judge's dismissal, we do not decide this
issue.